UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

*In re*

COCO SUSHI, LLC,

CASE NO:  24-13421-LMI

_____Debtor._____/

CHAPTER 11
Subchapter V

COCO SUSHI, LLC,

        Plaintiff,

vs.

SAMSON MCA LLC

Adv. Case No.:  _____- _____

_____Defendant._____/

### ADVERSARY COMPLAINT

Plaintiff, Coco Sushi LLC (the "Plaintiff" or "Debtor"), sues Samson MCA LLC (the "Lender" or "Defendant"). In support of this Complaint, the Plaintiff alleges as follows:

### I.    NATURE OF ACTION, PARTIES, JURISDICTION AND VENUE

1.    The Plaintiff sues the Lender: (i) to avoid and recover preferential transfers pursuant to sections 547 and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, (the "Bankruptcy Code"); and (ii) for disallowance of the Lender's claim in the bankruptcy case.

2.    The Plaintiff is the debtor in possession in the bankruptcy case.

3.    The Plaintiff is a limited liability company incorporated in the State of Florida. Its officers, registered agent, and principal place of business are located in Miami-Dade County, Florida and within the Southern District of Florida.

1



4.      The Defendant is a foreign corporation that is authorized to do business in Florida.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 (b) and 1334(b).

6.      This is a core proceeding for which the Court is authorized to determine all matters regarding this case in accordance with 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.      FACTUAL BACKGROUND

### A.  Procedural History

8.      On April 9, 2024, the Debtor commenced the Bankruptcy Case by filing voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code (the "Petition Date").

9.      The Debtor is operating its business and managing its affairs as debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

10.      The Debtor is a Florida limited liability company that owns and operates a Japanese Restaurant located in Coconut Grove Florida.

### B.  The Loan Agreement

11.      On or about July 19, 2023, the Debtor and the Lender entered into the *Revenue Based Factoring (RBF/ACH) Agreement* (the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A.**

12.      Under the Loan Agreement, the Plaintiff received $489,925.00 from the Lender, purportedly representing an 8% (the "Specified Percentage") sale of the Debtor's proceeds from future receipts.

2



13.    Pursuant to the Loan Agreement, if Plaintiff defaulted under its obligations to the Lender, then the Specified Percentage jumped from 8% of each transaction, to 100% collection on each receipt collected by the Debtor.

14.    In return for the loan, the Loan Agreement requires the Debtor to pay $620,000 (the "Purchased Amount") to the Lender, in weekly installments of $12,400.00 (the "Weekly Payments").

15.    Although not explicitly stated in the Loan Agreement, the term of the loan is 50 weeks.

16.    The Loan Agreement has an effective annual rate of interest of at least 27.6%.

**C.    The Loan Agreement is a Loan, Not a Sale of Future Receipts.**

17.    Notwithstanding its title, the Loan Agreement was not a sale/purchase of future receipts.  Plain and simple, it was a loan.

18.    The Lender attempted to shield itself from state usury laws by drafting the loan as a purchase of "Future Receipts."

19.    The substance of the Loan Agreement demonstrates that it is a loan.

20.    The Loan Agreement has none of indicia of a true sale and all the indicia of a loan.  Among other things: (i) the terms of the Loan Agreement failed to transfer the risk and benefits of ownership of the Future Receipts from the Debtor to the Lender, (ii) the Debtor remained absolutely liable for repayment of the Purchased Amount; (iii) the Lender had full recourse rights against the Debtor and its owner; (iv) the reconciliation provisions in the Loan Agreement were illusory and in the control of the Lender; and (v) the Weekly Payments were fixed and required payment within the specific time period chosen by the Lender.

3

21.     The Loan Agreement provided for a security interest in the future receipts of the Debtor, stated in pertinent part:

    a.   "The sale of the Future Receipts creates a security interest as defined in the UCC …"

    b.   "this Agreement constitutes a 'security agreement' under the UCC"

    c.   Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts."

    d.   "Seller authorized buyer to file on or more UCC-1 forms …"

*See* Loan Agreement, at ¶12.

### D.  <u>The Lender Controlled the Debtor and is an Insider of the Debtor.</u>

22.     The Lender is an "insider" of the Plaintiff under 11 U.S.C. § 101(31)(B)(iii) and or 101(31)(F), as it was in control of certain operations and the assets of the Plaintiff. Specifically, the following provisions of the Loan Agreement demonstrate the control the Lender had over the Debtor:

    a.   The Debtor agreed not to change bank account information without prior written consent of the Lender.  *See* Loan Agreement, at ¶ 3;

    b.   In the event that the Debtor opened a new bank account, the Lender had the right to notify the financial institution and direct the financial institution to remit payments directly to the Lender.  *Id*;

    c.   The Lender had full access to all financial information of the Debtor, including bank statements, bank authorizations and passwords, tax returns, credit reports and financial statements.  *Id.* at ¶ 7;



d.  The Lender had authority to contact any current or prior bank of the Debtor to determine whether Debtor was complying with the terms of the Loan Agreement. *Id.* at ¶ 8;

e.  The Debtor was prohibited from changing banks or opening additional bank accounts. *Id.* at ¶ 11;

f.  Despite its purported purchase of only 8% of future receipts, the Lender required the Debtor to deposit all receipts into bank account monitored by the Lender. *Id.*;

g.  Debtor could not change the name of its business without prior written consent of Lender. *Id.*;

h.  Debtor could not change location of business without prior written consent of the Lender. *Id.*;

i.  Debtor could not sell substantially all of its assets without prior written consent of the Lender. *Id.*;

j.  The Lender prohibited the Debtor from closing its business for renovations, repairs or any other purpose. *Id.*;

k.  The Lender had the absolute right to enter the Debtor's premises, without notice to inspect the Debtor's premises and checking transaction terminals. *Id.* at ¶ 12;

l.  The Lender, without notice, was provided access to all of the Debtor's employees and records. *Id.;*

5

m.  The Debtor was required to provide information to the Lender regarding its business operations, banking relationships, vendors, landlord or other information to allow the Lender to contact any of these parties.  *Id.;*

n.  The Debtor granted the Lender a limited Power of Attorney to take any action in the Debtor's name to facilitate the Loan Agreement.

**COUNT I**
**AVOIDANCE AND RECOVERY OF PREFERENTIAL**
**TRANSFERS PURSUANT TO 11 U.S.C. § 547**
**(INSIDER)**

23.  The Plaintiff realleges and restates paragraphs 1 through 22 as if fully restated herein.

24.  On or within 1 year prior to the Petition Date, that is between April 9, 2023, and April 9, 2024 (the "Insider Preference Period"), the Debtor made certain transfers (the "Insider Preferential Transfers") to the Lender totaling at least $263,668.38.  Evidence of the Insider Preferential Transfers is attached as **Exhibit B.**[1]

25.  The Insider Preferential Transfers were to or for the benefit of the Lender, who was a creditor of the Debtor at the time of the Insider Preferential Transfers.

26.  The Insider Preferential Transfers constituted a transfer of an interest of the

---

[1] The Plaintiff reserves the right to bring additional claims against the Defendant and nothing contained herein shall be deemed a waiver of any rights or causes of action that the Plaintiff or the Estate may have against the Defendant. Also, to the extent that the Defendant has filed a proof of claim or has a claim listed on the Debtor's schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtor or the Estate (collectively, the "Claims"), the Plaintiff reserves the right to object to such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j), and this Complaint is not intended to be, nor should it be construed as a waiver of such right.   Additionally, during the course of this proceeding, the Plaintiff may learn (through discovery or otherwise) of additional avoidable transfers made to the Defendant.  It is the Plaintiff's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property and to or for the benefit of Defendant or any other transferee.   The Plaintiff reserves the right to amend this Complaint to include: (i) further information regarding the Transfer, (ii) additional transfers, (iii) modifications of and/or revision to the Defendant's name, and/or (iv) additional defendants that may become known to the Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for all such amendments to relate back to the date of filing of this original Complaint.



property of the Debtor.

27.     The Insider Preferential Transfers were made for or on account of an antecedent debt owed by the Debtor before such transfers were made.

28.     The Insider Preferential Transfers were made while the Debtor was insolvent.

29.     The Insider Preferential Transfers enabled the Defendant to receive more than it would have received if:

     a.  the case were a case under Chapter 7 of the Bankruptcy Code;

     b.  the Insider Preferential Transfers had not been made; and

     c.  the Lender received payment of such debt owing to it to the extent provided by the provisions of the Bankruptcy Code.

30.     The Lender is an "insider" of the Debtor pursuant to 11 U.S.C. 101(31)(B)(iii) and 101(31)(F) as it was in control of the operations and the assets of the Debtor.

31.     The Plaintiff is entitled to avoid the Insider Preferential Transfers pursuant to 11 U.S.C. § 547(b).

32.     Prior to the filing of this Complaint, the Plaintiff conducted reasonable due diligence in the circumstances of the case and has taken into account the Defendant's known or reasonably knowable affirmative defenses under 11 U.S.C. 547(c).

33.     By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §547.  As result, the Plaintiff may recover $263,668.38 from the Defendant pursuant to 11 U.S.C. § 550(a).

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter a Judgment:

A.     Declaring the Insider Preferential Transfers to be preferential transfers pursuant to Section 547 of the Bankruptcy Code;



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

B.     Avoiding the Insider Preferential Transfers as preferential transfers pursuant to Section 547 of the Bankruptcy Code; and

C.     Granting such other and further relief as may be just and equitable.

## COUNT II
## AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547

34.     The Plaintiff realleges and restates paragraphs 1 through 22 as if fully restated herein.

35.     On or within 90 days' prior to the Petition Date, that is between January 10, 2024 and April 9, 2024 (the "90-Day Preference Period"), the Debtor made certain transfers (the "90-Day Preferential Transfers") to the Lender totaling at least $71,123.65.  Evidence of the 90-Day Preferential Transfers is attached as **Exhibit C.**[2]

36.     The 90-Day Transfers were to or for the benefit of the Lender, who was a creditor of the Debtor at the time of the 90-Day Preferential Transfers.

37.     The 90-Day Preferential Transfers constituted a transfer of an interest of the property of the Debtor.

38.     The 90-Day Preferential Transfers were made for or on account of an antecedent

---

[2] The Plaintiff reserves the right to bring additional claims against the Defendant and nothing contained herein shall be deemed a waiver of any rights or causes of action that the Plaintiff or the Estate may have against the Defendant. Also, to the extent that the Defendant has filed a proof of claim or has a claim listed on the Debtor's schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtor or the Estate (collectively, the "Claims"), the Plaintiff reserves the right to object to such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j), and this Complaint is not intended to be, nor should it be construed as a waiver of such right.   Additionally, during the course of this proceeding, the Plaintiff may learn (through discovery or otherwise) of additional avoidable transfers made to the Defendant.  It is the Plaintiff's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property and to or for the benefit of Defendant or any other transferee.   The Plaintiff reserves the right to amend this Complaint to include: (i) further information regarding the Transfer, (ii) additional transfers, (iii) modifications of and/or revision to the Defendant's name, and/or (iv) additional defendants that may become known to the Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for all such amendments to relate back to the date of filing of this original Complaint.



debt owed by the Debtor before such transfers were made.

39.     The 90-Day Preferential Transfers were made while the Debtor was insolvent.

40.     The 90-Day Preferential Transfers enabled the Defendant to receive more than it would have received if:

    a.  the case were a case under Chapter 7 of the Bankruptcy Code;

    b.  the 90-Day Preferential Transfers had not been made; and

    c.  the Lender received payment of such debt owing to it to the extent provided by the provisions of the Bankruptcy Code.

41.     The Plaintiff is entitled to avoid the 90-Day Preferential Transfers pursuant to 11 U.S.C. § 547(b).

42.     Prior to the filing of this Complaint, the Plaintiff conducted reasonable due diligence in the circumstances of the case and has taken into account the Defendant's known or reasonably knowable affirmative defenses under 11 U.S.C. 547(c).

43.     By reason of the foregoing, the 90-Day Transfers are avoidable pursuant to 11 U.S.C. §547.  As result, the Plaintiff may recover $71,123.65 from the Defendant pursuant to 11 U.S.C. § 550(a).

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter a Judgment:

A.     Declaring the 90-Day Preferential Transfers to be preferential transfers pursuant to Section 547 of the Bankruptcy Code;

B.     Avoiding the 90-Day Preferential Transfers as preferential transfers pursuant to Section 547 of the Bankruptcy Code; and

C.     Granting such other and further relief as may be just and equitable.

**COUNT III:**



## RECOVERY OF THE TRANSFERS PURSUANT TO BANKRUPTCY CODE § 550

44.     Plaintiff realleges the allegations set forth in the paragraphs 1 through 22 and incorporates those allegations by reference.

45.     The Insider Preferential Transfers and 90 Day Preferential Transfers (the together, the "Transfers") are avoidable pursuant to Bankruptcy Code §547(b).

46.     With respect to the Transfers, the Lender was either the initial transferee or entity for whose benefit the Transfers were made under Bankruptcy Code §550(a)(1); or, alternatively, an immediate or mediate transferee within the meaning of Bankruptcy Code §550(a)(2).

47.     To the extent that the Lender was or is found to be an immediate or mediate transferee within the meaning of Bankruptcy Code §550(a)(2), the Lender was not a transferee who took for value, in good faith, without knowledge of the voidability of the Transfers, within the meaning of 11 U.S.C. §550(b)(1); or an immediate or mediate good faith transferee thereof within the meaning of 11 U.S.C. §550(b)(2).

48.     The Transfers are, or the value of the Transfers is, recoverable from the Lender by the Plaintiff pursuant to Bankruptcy Code § 550.

WHEREFORE, the Plaintiff respectfully requests that the Court  enter  a judgment against the Lender:

A.     Declaring the Lender to be either an initial transferee of the Transfers or entity for whose benefit the Transfers were made under Bankruptcy Code § 550(a)(1); or, alternatively, an immediate or mediate transferee of the Transfers within the meaning of Bankruptcy Code § 550(a)(2);

Agentis

45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com

B.     Directing the Lender to turn over to the Plaintiff the Transfers or the value of the Transfers, or awarding to the Plaintiff money damages against the Lender in the amount of the Transfers, plus pre- and post-judgment interest; and

C.     Granting such other and further relief as may be equitable and just.

**COUNT III:**
**OBJECTION TO CLAIM**

49.     The Plaintiff realleges the allegations set forth in the paragraphs 1 through 22 and incorporates those allegations by reference.

50.     The Debtor scheduled an unsecured claim, in an unknown amount, for the Lender.

51.     As of the date of this Complaint, the Lender has not filed a claim in the Debtor's bankruptcy case.

52.     Section 502(d) of the Bankruptcy Code states that "the court shall disallow any claim of any entity from which property is recoverable under section … 550, of this title or that is a transferee of a transfer avoidable under section … 547 … this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section … 550 …" 11 U.S.C. § 550.

53.     Here, the Lender is the transferee of the Transfers, which are avoidable under section 547, and recoverable under section 550.

54.     Accordingly, the Court should disallow the scheduled claim of the Lender, and any future claim filed by the Lender.

55.     The Defendant voluntarily accepted and retained the benefit conferred by accepting the Transfers.

WHEREFORE, the Plaintiff respectfully requests the Court to enter a judgment:



**45 Almeria Avenue · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com**

A.  Disallowing the scheduled claim of the Lender and any future claim filed by the

Lender; and

B.      Granting such other and further relief as may be equitable and just.

Dated: May 17, 2024

AGENTIS PLLC
**Counsel for the Plaintiff**
45 Almeria Avenue
Coral Gables, Florida 33134
T. 305.722.2002
www.agentislaw.com

By:    */s/ Jesse R. Cloyd*
         Jesse R. Cloyd
         Florida Bar No: 58388
         jrc@agentislaw.com

12

**Composite Exhibit "A"**



**<u>Revenue Based Factoring (RBF/ACH) Agreement</u>**
**<u>Phone: 347-442-7999 Fax: 718-304-1163</u>**
**<u>Samson MCA LLC</u>**
**<u>Contract ID #60523197</u>**
**<u>Steven Markowitz, Jr.</u>**

## Sale of Future Receipts Agreement

| Seller's Legal Name: COCO SUSHI LLC/ SUSHI GARAGE LLC | D/B/A: SUSHI GARAGE | Form of Business Entity and State of Incorporation: LLC / FL |
|---|---|---|
| Street Address: 1111 LINCOLN RD STE 305 | City, State: MIAMI BEACH, FL | Zip: 33139 |
| Mailing Address: | City, State: | Zip: |
| Primary Contact Name: JONAS J MILLAN CAPRILES | Primary Contact Title: OWNER | Primary Contact Phone Number: 786-238-8804 |
| Primary Contact E-Mail Address: JONAS@JUVIAGROUP.COM | | |
| Secondary Contact Name: | Secondary Contact Title: | Secondary Contact Phone Number: |
| Secondary Contact E-Mail Address: | | |

Seller's Deposit Account

Name of Depository Institution: First Horizon Bank    ABA Transit/Routing #: 265270413    Checking Account #: 3896

| Purchase Price Paid to Seller $500,000.00 | Initial Periodic Amount $12,400.00 |
|---|---|
| Purchased Amount of Future Receipts $620,000.00 | **What is the Initial Periodic Amount?** |
| Specified Percentage 8% | The Initial Periodic Amount is an estimate of the Specified Percentage of your average sales revenue. We will debit the Periodic Amount from your Account (as defined herein) each WEEK ON THURSDAYS, subject to your actual revenue. We based the Initial Periodic Amount on information you provided or made available to us to calculate your average revenue over a period of time prior to the date of this Agreement. Please refer to Section 4 of this Agreement for how you can adjust the Periodic Amount. |
| Periodic Frequency [WEEKLY] | |

| Itemization Of Net Amount Funded To Seller | Purchase Price | $500,000.00 | |
|---|---|---|---|
| | Origination Fee | $10,000.00 | |
| | Prior balances | $0.00 | |
| | Processing Fee | $75.00 | |
| | Administrative Fee | $50.00 | Administrative Fee (applied on the initial day of funding and every 30 days to follow, until the specified amount is paid in full) NOT INCLUDED IN TOTAL DEDUCTION BELOW |
| | Wire/ACH Fee | $50.00 | not included in total deductions |
| | **Net Amount Funded to Seller** | $489,925.00 | |

This Sale of Future Receipts Agreement ("Agreement") effective July 19, 2023, is made by and between Samson MCA LLC ("Buyer"), the business identified above ("Seller"), and each Guarantor identified below (each a "Guarantor").

Seller, hereby sells, and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts identified above (the "Purchased Amount") of the proceeds of each future sale made by Seller (collectively "Future Receipts") and will deliver the Specified Percentage of Future Receipts and pay the origination fee identified above (the "Origination Fee") in accordance with this Agreement. Seller, in collecting the Future Receipts, shall be deemed a trustee of the specified percentage of receivables for the benefit of Buyer. It being expressly acknowledged that Merchant is merely holding such funds in trust for the benefit of Buyer and at all times Buyer is the sole owner of its share of the future receipts.

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes.

Seller: [COCO SUSHI LLC/ SUSHI GARAGE LLC dba SUSHI GARAGE]

Jonas Millan    Manager

Agreed to by:_____Signature,_____its_____(Title)

Agreed to by:_____Signature,_____its_____(Title)

**Agreement of Each Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes.

<u>Notice</u>: This Agreement contains a personal guaranty of performance, and by signing below, you agree that you will be personally liable for the prompt and complete performance of certain obligations of Seller as described in this Agreement.

Jonas Millan

Name:_____Signature: _____

Name:_____Signature: _____

# Terms and Conditions

1. **Future Receipts.** "Future Receipts" includes all payments made by cash, check, Automated Clearing House ("<u>ACH</u>") or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "<u>Payment Card</u>") or other form of monetary payment in the ordinary course of Seller's business.  As payment for the Purchased Amount, Buyer will pay to Seller the Purchase Price, minus any fees and amounts to satisfy prior balances shown above.

2. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Amount Funded to Seller, shown above. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to Seller's account, shown above (the "<u>Account</u>"), which is held at the bank or depository institution referenced above (the "<u>bank</u>"), and the ability to withdraw the Initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

3. **Delivery of Purchased Amount.** Seller shall, on each Remittance Date remit the Specified Percentage of its actually collected receipts to Buyer until such time as the full Purchased Amount, and any and all fees and other charges due to Buyer are fully remitted to Buyer. The Parties agree, solely as a convenience, to utilize the Initial Periodic Amount set forth above, subject to Reconciliation and Adjusting the Periodic Amount as set forth below, in lieu of calculating the Specified Percentage of Seller's actually collected receipts on daily basis. Seller authorizes Buyer to debit the Initial Periodic Amount or any updated periodic amount (the "<u>Periodic Amount</u>") from the Account each Remittance Date by either ACH or electronic check. Seller will provide Buyer with all required Account information and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. If any draft or electronic debit is returned for insufficient funds, then Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic or other remotely created check or ACH debit attempt. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable during the course of this Agreement, subject to the Reconciliation and Adjusting the Periodic Amount provisions contained herein.

   In the event that Seller changes or permits changes to the Account or the ACH authorization approved by the Buyer or adds an additional bank or depository institution account (each such additional entity, also referred to as a bank), Buyer shall have the right, without waiving any of its rights and remedies and without notice to Seller or any Guarantor, to notify the new or additional bank of this Agreement and to direct such new or additional bank to remit to the Buyer all or any portion of the amounts received by such bank in the aggregate totaling the Periodic Amount. Any such new account shall also be deemed an Account.

4. **Reconciliation and Adjusting the Periodic Amount (IMPORTANT PROTECTION FOR SELLER).** The initial Periodic Amount is intended to represent the Specified Percentage of the Future Receipts. At any time, Seller or Buyer may request a reconciliation of Seller's actual revenue to adjust the Periodic Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage.

a. **How Seller may Request a Reconciliation**. Seller may request a reconciliation in writing via e-mail at reconciliations@samsonfunding.com

b. **How Buyer may Request a Reconciliation**. Buyer may request a reconciliation in writing via e-mail at the Primary Contact E-Mail Address set forth above.

c. **Review of Reconciliation Information.** Any reconciliation request by Seller must include a copy of a bank statement for each account into which Seller deposits receipts from sales itemizing account activity from the date of this Agreement through the date of the reconciliation request (the "Applicable Period). Buyer shall within three business days review Seller's bank statements to determine if the aggregate amount of remittances during the Applicable Period was greater or less than the Specified Percentage of Seller's actual receipts for that period (the "Reconciliation Review"). If necessary to verify the bank statements, Buyer may request reasonable additional documentation including view-only access to each account. Buyer shall not declare Seller in breach of this Agreement while Buyer is reviewing Seller's reconciliation request.

d. **Refund Reconciliation.** In connection with any Reconciliation Review, either party may request a refund reconciliation. If requested, Buyer will determine whether the amount by which the aggregate amount of all of Seller's remittances to Buyer over the course of this Agreement was greater or less than the Specified Percentage of Seller's actual receipts during the course of this Agreement. Within three business days after completing the Reconciliation Review, Buyer shall credit the Authorized Account with any excess or debit the Authorized Account for any shortfall. If the Seller is entitled to a credit, Buyer shall not declare Seller in breach of this Agreement for three business days including the date Buyer credits the Authorized Account with any excess funds. For the avoidance of doubt, the day Seller initiates payment to the Buyer shall count as day one.

e. **Changes to the Periodic Amount.** Within three business days after any Reconciliation Review, Buyer shall modify the Periodic Amount to more closely reflect the Specified Percentage of Seller's actual receipts in the previous (2) calendar weeks. At the end of two (2) calendar week period, the Seller may request another adjustment pursuant to this paragraph or it is agreed that the Periodic Amount shall revert to the Periodic Amount as agreed upon on Page 1 of this Agreement.

5. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount and Seller retains no legal or equitable interest therein.

6. **Fees and Charges.** The fees and charges owed by Seller are as described in this Agreement. Some or all of the Origination Fee may be paid to a broker engaged by the Seller. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer.

7. **Credit Report and Financial Information Authorizations.**

a. Seller and each of the Guarantors signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

b. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or

at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

c. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

8. **Authorization to Contact Current and Prior Banks.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement. Seller hereby further authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collection purposes and in order to confirm that Seller is exclusively using the Account identified above, or any other Account approved by Buyer, for the deposit of all sales receipts of the Seller.

9. **Right to Cancel.** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within three (3) calendar days after Buyer has delivered the Net Amount Funded. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and returning the Net Amount Funded to Buyer. For the Seller's right to cancel to be effective, Buyer must receive both the notice and the return of the Net Amount Funded within three (3) calendar days after the Buyer has delivered the Net Amount Funded.

10. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

11. **Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received 1) the Purchased Amount and 2) all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

a. **No Diversion of Future Receipts.** Seller must deposit all Future Receipts into the Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account on a daily basis. Seller agrees not to (i) change the Account without the express written consent of Buyer, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or, (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts.

b. **Stacking Prohibited.** Seller shall not, without Buyer's prior written consent, enter into any loan agreement or any agreement for the sale of Future Receipts. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

c. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly and accurately represent the financial condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller further agrees to authorize the release of any past or future tax returns to Buyer.

d. **Compliance with Law and Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.

e. **Authority to Enter into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

f. **Change of Name or Location or Sale or Closing of Business.** For so long as the full Purchased Amount has not been remitted to Buyer, Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change

any of its places of business without prior written consent of Buyer. Except pursuant to the filing for Bankruptcy, Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently.  Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer 10 calendar days' notice to the extent practicable.

g.    **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.** As of the date of this Agreement, Seller does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney or a debt relief organization within six months prior to the date of this Agreement. Seller further warrants that as of the date of this Agreement (i) it does not anticipate filing a bankruptcy petition nor engaging the services of a debt relief organization, (ii) it does not anticipate that an involuntary petition will be filed against it and (iii) it does not have an intent to shut down or dissolve the business in the imminent future.

h.    **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes and other assessments, including but not limited to employment, sales and use taxes.

i.    **No Violation of Prior Agreements.**  Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j.    **Seller's Knowledge and Representation.**  Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k.    **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete. Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

**12.  Rights of Buyer.**

a.    **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by Seller to Buyer pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Buyer. To the extent the Future Receipts are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located ("UCC") then: (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without a breach of this Agreement, Buyer may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

b.    **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount is the sole property of Buyer.  The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same.  Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c.    **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and

or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d.    **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii) that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e.    **ACH Authorization.** Seller represents and warrants that (i) the Account is solely owned by Seller; (ii) the person executing this Authorization on behalf of Seller is an authorized signer on the Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Account, and (iii) the Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH transaction is rejected by Seller's bank for any reason other than a stop payment order placed by Seller with its bank, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH transaction that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any payment or credit, Seller authorizes Buyer to initiate ACH entries to or from the Account to correct the error. Seller acknowledges that the origination of ACH entries to and from the Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to the terms of this Authorization. Seller requests the bank that holds the Account to honor all ACH entries initiated in accordance with this Authorization.

13.  **Remedies for Seller's Breach of this Agreement.** If Seller violates any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a.    The Specified Percentage shall equal 100%. The full undelivered Purchased Amount plus all fees and charges (including collection and legal fees as more fully described in this Agreement) assessed under this Agreement will become due and payable in full immediately.

b.    Buyer may enforce the provisions of the Personal Guaranty of Performance against each Guarantor.

c.    Seller shall pay to Buyer all reasonable costs associated with Seller's breach including but not limited to court fees and attorney's fees calculated at 30% of the unremitted Purchased Amount at the time of Seller's breach. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

d.    Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

e.    Subject to arbitration as provided in Section 28 of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

14.  **Modifications, Amendments.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by all Parties.

15.  **Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

16. **Personal Guaranty of Performance.** Guarantor agrees to irrevocably, absolutely and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

    a.   Seller's obligation to remit the Specified Percentage of its future receipts until the Purchased Amount is fully remitted to Buyer;

    b.   Seller's obligation to not (i) change the Account, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts;

    c.   Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

    d.   Seller's obligation to not change any of its places of business without prior written consent by Buyer;

    e.   Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

    f.   Seller's obligation to not enter into any merchant cash advance or any loan agreement that relates to or encumbers its Future Receipts with any party other than Buyer without Buyer's prior written consent for the duration of this Agreement; and

    g.   Seller's obligation to provide truthful, accurate, and complete information as required by this Agreement.

17. **Guarantor Waivers.** Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Personal Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller's other obligations to Buyer. In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Performance Guaranty: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Performance Guaranty. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Performance Guaranty: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

18. **Guarantor Acknowledgement.** Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the Jury Waiver, Class Action Waiver and Arbitration sections.

19. **Notices.**

    a.   **Notices from Buyer.** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller and Guarantor (as applicable) by regular mail or by e-mail, at Buyer's option and Seller and Guarantor each consent to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

    b.   **Notices from Seller and Guarantor.** Subject to Section 4 of this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20. **Binding Effect, Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that neither Seller nor Guarantor shall not have the right to assign its respective rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. Except as set forth in the Arbitration section, this Agreement shall be governed by and

construed in accordance with the laws of the state of New York without regard to any applicable principles of conflicts of law. Seller and Guarantor understand and agrees that (i) Buyer is located in New York, (ii) Buyer makes all decisions from Buyer's office in New York, (iii) the Agreement is made in New York (that is, no binding contract will be formed until Buyer receives and accepts Seller's signed Agreement in New York, and (iv) Seller's payments are not accepted until received by Buyer in New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any state court sitting in New York (the "Acceptable Forums"). Seller and Guarantor hereby waive their right to remove any action commenced by Buyer in connection to this Agreement to any federal court. Seller and Guarantor agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller and Guarantor waive any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. Buyer, Seller and Guarantor further agree that the mailing by certified or registered mail, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

21. **Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

22. **Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against Buyer as drafter.

23. **Entire Agreement and Severability.** This Agreement embodies the entire agreement among Seller, Guarantor, and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

25. **Authorization to Contact.**

    a.    **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

    b.    **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

26. **JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY**

**AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

27. **CLASS ACTION WAIVER.  BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

28. **ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM. A COPY OF THE APPLICABLE RULES MAY BE FOUND AT HTTPS://WWW.ADR.ORG/RULES UNDER COMMERCIAL ARBITRATION RULES. EACH PARTY SHALL BEAR ITS OWN EXPENSES REGARDING ARBITRATION FILING FEES AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, THE PARTIES AGREE TO EQUALLY SHARE ADMINISTRATIVE COSTS AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES. SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.**

29. **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: 17 STATE STREET, SUITE 630, NEW YORK, NEW YORK 10004 ATTENTION: SAMSON MCA LLC**

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

[COCO SUSHI LLC/ SUSHI GARAGE LLC dba SUSHI GARAGE] ("Seller") hereby authorizes Samson MCA LLC ("Buyer") to present automated clearing house (ACH) debits to the following account in the amount of fees and other payments due to Buyer from Seller under the terms of that Purchase and Sale of Future Receipts Agreement (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Buyer to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if Seller breaches the Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute a breach of the Agreement for the Sale of Future Receipts. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this authorization.

|   |   |
|---|---|
|   | first horizon |
| Transfer Funds To/From: | Name of Bank: _____ |
|   | 265270413 |
|   | ABA Transit/Routing #: _____ |
|   | 3896 |
|   | Account #: _____ |

This authorization is to remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Agreement.

Seller Information:

Seller's Name: COCO SUSHI LLC/ SUSHI GARAGE LLC dba SUSHI GARAGE

Signature of Authorized Representative: _____
Jonas Milan

Print Name: _____
Manager

Title: _____

Seller's Tax ID: 84-3147867

Date: ____07/19/2023____

**Composite Exhibit "B"**

**Exhibit "B"**

| Transferee | Transferor | Act# | Date | Amount |
|---|---|---|---|---|
| Samson | Coco Sushi, LLC | #3896 | 7/31/2023 | $ 12,400.00 |
| Samson | Coco Sushi, LLC | #3896 | 8/7/2023 | $ 12,400.00 |
| Samson | Coco Sushi, LLC | #3896 | 8/14/2023 | $ 12,400.00 |
| Samson | Coco Sushi, LLC | #3896 | 8/21/2023 | $ 12,400.00 |
| Samson | Coco Sushi, LLC | #3896 | 8/28/2023 | $ 12,400.00 |
| Samson | Coco Sushi, LLC | #4268 | 9/29/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/2/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/3/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/3/2023 | $ 50.00 |
| Samson | Coco Sushi, LLC | #4268 | 10/4/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/5/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/6/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/10/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/11/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/12/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/13/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/16/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/17/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/18/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/19/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/20/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/23/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/25/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 10/26/2023 | $ 2,556.75 |
| Samson | Coco Sushi, LLC | #4268 | 10/30/2023 | $ 2,556.75 |
| Samson | Coco Sushi, LLC | #4268 | 10/31/2023 | $ 2,556.75 |
| Samson | Coco Sushi, LLC | #4268 | 11/1/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/2/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/3/2023 | $ 50.00 |
| Samson | Coco Sushi, LLC | #4268 | 11/3/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/4/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/5/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/6/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/7/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/8/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/9/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/10/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/13/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/14/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/15/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/16/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/17/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/20/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/21/2023 | $ 2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/22/2023 | $ 2,556.76 |

**Exhibit "B"**

| Transferee | Transferor | Act# | Date | Amount |
|---|---|---|---|---|
| Samson | Coco Sushi, LLC | #4268 | 11/23/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/24/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/27/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/28/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/29/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 11/30/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/1/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/4/2023 | $         50.00 |
| Samson | Coco Sushi, LLC | #4268 | 12/4/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/5/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/6/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/7/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/8/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #4268 | 12/12/2023 | $    2,556.76 |
| Samson | Coco Sushi, LLC | #6496 | 2/7/2024 | $  71,123.65 |
| **Total** | | | | **$ 263,668.38** |

**Composite Exhibit "C"**

**Exhibit "C"**

| Transferee | Transferor | Act# | Date | Amount |
|---|---|---|---|---|
| Samson | Coco Sushi, LLC | #6496 | 2/7/2024 | $  71,123.65 |
| **Total** | | | | **$  71,123.65** |